**E-FILED**
Wednesday, 27 March, 2013  04:47:53 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| JEROME BELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 12-cv-3112 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jerome Bell appeals from the denial of his application for Social Security Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g).  Bell has filed a Brief in Support of Motion for Summary Judgment (d/e 8), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e10).  The parties have consented to have this matter decided by this Court.  Consent to Proceed before a United States Magistrate and Order of Reference entered October 31, 2012 (d/e 12).  For the reasons set forth below, the decision of the Defendant Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Bell was born on March 20, 1961.  He completed high school and has completed some college coursework.  R. 38-39.  In the past, he worked as a bagger, a stock clerk, a food products delivery driver, a carpet cleaner, and a route delivery driver.  R. 26, 44-47.  He last worked at any substantial gainful employment on November 23, 2006.  R. 20.  He suffers from a right shoulder tendon tear, degenerative changes in his left knee, degenerative disc disease in the cervical spine, depression, polysubstance abuse, and anxiety.  R. 20, 21, 38-39.

On October 17, 2006, Bell saw Dr. Gerry V. Lazzareschi, M.D., at the Ukiah Valley Medical Center in Ukiah, California.  Bell complained of knee pain.  R. 396.  An x-ray showed no fracture or dislocation.  R. 396. Dr. Lazzareschi diagnosed Bell with a minor strain of the left MCL.  He prescribed an immobilizer and Naprosyn, and directed Bell to elevate his leg.  R. 396.

On July 23, 2007, Bell was hospitalized at the Ukiah Valley Medical Center for a brain mass, pneumonia, alcoholic hepatitis, and hepatitis B. R. 423-24.  Bell was homeless at the time.  An MRI showed an 8 mm area of increased density in the parietal lobe and three smaller lesions in the left frontal lobe.  Bell was treated for pneumonia and released.  He was

referred to the Mendocino Community Health Clinic in Mendocino, California, for follow up.  R. 423-24.

On September 17, 2007, Bell went to the emergency room at Ukiah Valley Medical Center for epigastric abdominal pain, gastritis, alcohol abuse, and a history of seizure disorder.  Bell was diagnosed with epigastric and abdominal pain secondary to alcoholic hepatitis and alcoholic pancreatitis.  He was rehydrated and released.  R. 375-76.

On September 25, 2007, Bell was seen by the Crisis Intervention Contact (Contact) at the Mental Health Branch of the Mendocino County, California, Health and Human Services Agency.  R. 358-59.  Bell was referred by the Ukiah Community Center for a mental health assessment. Bell reported that he was upset because his girlfriend died in his arms a year earlier.  He reported that she died of a hemorrhage related to cancer. He also reported that he also lost visitation rights with his daughter. R. 359.  Bell admitted alcohol abuse, but reported that he had not had a drink in over a week.  Bell reported that he was taking Klonadine, Dilantin, Valium, and Prozac as prescribed by a community health clinic.  R. 355-62. The Contact referred Bell to the Mendocino County Community Health Clinic.  The Contact's report indicated that Bell had a normal affect and his thought processes were intact, but showed some paranoia.  R. 361.  The

report indicated that Bell was not a danger to himself or others and was not gravely disabled.  R. 358.

On October 6, 2007, Bell went to the emergency room at Ukiah Valley Medical Center complaining of ankle swelling.  Bell was diagnosed with cirrhosis and pitting edema of the lower extremities.  R. 367-68.  He was given Spironolactone to decrease swelling in the leg and was scheduled for a follow up the next day at the Mendocino Community Health Clinic.  R. 368.

On October 24, 2007, Bell went to the Mendocino Community Health Clinic complaining of right shoulder pain.  Bell reported maintaining alcohol abstinence and attending Alcoholics Anonymous (AA) meetings.  On examination, Bell had normal strength in the upper extremities and tenderness along the long head of the right biceps.  Bell was prescribed ibuprofen for the shoulder pain.  R. 479.

On November 1, 2007, Bell saw went to the Mendocino Community Health Clinic for shoulder pain, liver disease, and depression.  Bell saw a psychologist, Dr. Michael Mabanglo, L.C.S.W., Ph.D.  Dr. Mabanglo noted that Bell's alcoholism and depression impaired his ability to maintain housing and control his mood.  Dr. Mabanglo recommended referral for

possible restart of antidepressant medication and continuing support to avoid alcohol.  R. 469.

On October 26, 2007, Bell completed a Social Security Administration Functional Report—Adult form.  R. 221-28.  Bell reported that he could lift twenty to twenty-five pounds and could walk a mile and a half in fifteen to twenty minutes.  R. 226.

On November 20, 2007, Bell saw Dr. Jorge Allende, M.D., at the Mendocino Community Health Clinic.  Bell complained of right shoulder pain. Dr. Allende assessed right shoulder pain, possibly some acromioclavicular arthritis or derangement.  Dr. Allende planned to send for x-rays of the shoulder.  R. 472.

On December 19, 2007, Bell began physical therapy for his right shoulder.  The therapy continued until April 2008.  R. 586-88.

On January 3, 2008, Bell saw Dr. Mabanglo.  Dr. Mabanglo noted past diagnoses of alcoholism with cirrhosis of the liver, currently in remission for three months, depression, and shoulder pain.  R. 663.  Bell rated his depression at a 7 on a scale of 1-10.  R. 663.  Bell reported problems with his roommates at transitional housing.  R. 663.  Bell described significant depressive symptoms and generalized anxiety about social interactions.  R. 663.  Bell reported that attending AA meetings twice

a month was helpful.  R. 663.  Dr. Mabanglo diagnosed Bell with alcoholism and depression.  On January 25, 2008, Bell reported to Dr. Mabanglo that three new roommates caused his anxiety to go off the charts.  R. 658.

On January 23, 2008, Bell saw Dr. Kenneth Hoek, M.D., at the Mendocino Community Health Clinic, for an evaluation of Bell's right shoulder.  Bell complained of dull aching pain in both shoulders for more than a year; the pain in the right shoulder was worse than the left.  R. 661.  Bell could not remember a specific injury or incident that started the problems with his shoulders.  The pain came on gradually.  On examination, Bell's range of motion was 90% of normal in all directions when done slowly but with pain at the point of the shoulder.  Dr. Hoek did not detect any clicks or crepitation.  The pain increased with resistance.  Bell brought x-rays that showed some spurring and degenerative changes in the AC joint.  The x-rays were otherwise normal.  Dr. Hoek stated that the exam was similar in both shoulders.  R. 661.  Dr. Hoek's impression was chronic rotator cuff disease in both shoulders, worse in the right.  Dr. Hoek could not determine the severity of the problem without an MRI.  R. 661.

On February 11, 2008, Bell saw a psychologist Dr. Phillip Cushman, Ph.D., for a consultative mental status examination.  R. 532-39.  Bell told Dr. Cushman that he had not had a drink since September 2007. Dr. Cushman assessed Bell's intelligence quotient (IQ) as 87.  R. 537. Dr. Cushman diagnosed alcohol dependence in early remission and alcohol induced mood disorder.  R. 539.  Dr. Cushman also diagnosed dysthymic disorder, late onset.  R. 539.  Bell reported shoulder pain and psycho-social stressors as unemployment, homelessness, the death of his girlfriend, and limited family support.  R. 539.  Dr. Cushman assessed a Global Assessment of Functioning (GAF) of 60.  R. 539.

Dr. Cushman opined that Bell would benefit from ongoing psychiatric treatment in the form of counseling and, to a lesser degree, medication. Dr. Cushman opined that Bell appeared capable of performing some detailed, complex, simple and repetitive tasks in a vocational setting. Dr. Cushman opined that Bell appeared capable of regularly attending and consistently participating in work, if he liked the work, and did appear capable of dealing with the stress found in a competitive work environment. Dr. Cushman opined that Bell appeared capable of following simple verbal instructions from supervisors, but not complex instructions.  Dr. Cushman

opined that Bell appeared capable of getting along with supervisors, coworkers, and the general public, if he wanted to.  R. 539.

On March 7, 2008, Bell went to the Mendocino Community Health Clinic for a follow up after an emergency room visit for low back pain and hypertension.  The low back pain was somewhat resolved.  He was started on medication for hypertension.  R. 651.

On March 11, 2008, Dr. Lydia O. Mallare, M.D., prepared Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Bell.  R. 540-53.  Dr. Mallare opined that Bell had a mood disorder not otherwise specified and also a substance abuse disorder that was in remission.  R. 543, 546.  Dr. Mallare opined that Bell had mild restrictions on activities of daily living; mild difficulties maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. R. 548.  Dr. Mallare opined that Bell was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without unreasonable number and length of rest periods.  R. 551-52.

Dr. Mallare opined that Bell could perform some detailed tasks, could interact with others appropriately, and could adapt to changes in an ordinary workplace.  R. 553.

In March 20, 2008, Bell saw Dr. Mabanglo.  Bell reported that his depression was low and only an issue when he was at his transitional housing.  Bell reported that he was coping well.  He was taking antidepressants and was participating in counseling.  Bell was committed to recovery and was planning to attend community college.  Dr. Mabanglo assessed his depression as resolving with some issues of medication compliance.  R. 648.

On April 25, 2008, Bell saw Dr. Mabanglo.  Bell reported that his mood is stable and he was set to go to summer school at the community college.  Dr. Mabanglo assessed his depression as resolving.  R. 637. Dr. Mabanglo stated that Bell was showing significant stabilization, but was still at risk of relapse and would need a significant level of social service support.  R. 637.  Dr. Mabanglo listed a goal of returning Bell to previous level of functioning.  R. 640.

On August 16, 2008, state agency physician Dr. R. Paxton, M.D., prepared Psychiatrist Review Technique and Case Analysis.  R. 724-34, 757-58.  Dr. Paxton opined that Bell suffered from personality disorders

and substance addiction disorders, but his mental impairments were non-severe.  R. 724.  Dr. Paxton opined that Bell had mild restrictions on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace; and had one or two episodes of decompensation, each of extended duration.  R. 732.  Dr. Paxton also reviewed Bell's entire medical file and opined that Bell's impairments were non-severe.  R. 758.

On September 2, 2008, Dr. S. Amon, M.D., prepared a Residual Functional Capacity Assessment.  R. 735-39.  Dr. Amon opined that Bell could carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight hour workday; could sit for six hours in an eight hour workday; was unlimited in his ability to push and pull; could occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes or scaffolding; could only perform limited reaching with his left upper extremity; and should avoid concentrated exposure to hazards such as machinery or unprotected heights.  R. 736-38.

On October 13, 2009, Bell went to Blessing Hospital's Community Outreach Clinic in Quincy, Illinois.  Bell had moved back to Illinois from California.  Bell saw Julie Barry who was working under the supervision of

Dr. Phillip C. Wilson, M.D.[1]  Bell complained of pain in his shoulders, neck, and back.  Bell complained of pain with overhead elevation in both arms, with pain at his shoulder joints.  He also reported pain with external rotation of each shoulder.  R. 766.  On examination, Bell had full range of motion in his neck and spine.  R. 766.  Barry diagnosed Bell with hypertension, cervical and bilateral shoulder pain, and possible dyslipidemia.  R. 775.

On November 3, 2009, Bell saw Barry for a follow up visit.  Bell complained of a cold and pain in his left arm.  On examination, Bell had no pain and full range of motion.  Bell had slight crepitation in the anterior aspect of his right shoulder, but no pain in rotation of either shoulder. R. 762.

On November 4, 2009, Bell's cervical spine was x-rayed.  The x-rays showed narrowing of the C3 through C6 interspaces, with associated hypertrophic changes.  R. 771.  These findings were secondary evidence of degenerative changes.  His cervical spine was otherwise negative.  R. 771, 778.

On December 8, 2009, Bell saw Barry.  Bell complained of constant agonizing pain in his left shoulder with numbness and tingling down his arm into his fingertips on the left side.  Bell also complained that his right knee

---

[1] Based on the records, Barry appears to be a certified nurse practitioner (CNP).  See R. 768-69 (medical records list Barry's designation as CNP).

gave out and occasionally popped with movement.  R. 760.  Barry noted,

"He is requesting mental health counseling.  He makes it clear that he is

pursuing disability process and his attorney has recommended counseling."

R. 760.  On examination, Bell's knee had mild crepitation with extension

and tight flexion.  Dr. Wilson saw no swelling or redness in the knee.  Bell's

gait was steady.  Bell had decreased range of motion in the left shoulder

but no crepitation.  R. 760.  Barry ordered an x-ray of the right knee and an

MRI of the cervical spine.  R. 760.  Barry also referred Bell for physical

therapy.  R. 761.

On December 9, 2009, Bell's right knee was x-rayed.  R. 770.  The x-rays

showed mild narrowing of the medial joint space associated with small

marginal osteophytes and calcification in the anterior joint space consistent

with a large loose body.  R. The x-rays showed no joint effusion and no

evidence of any acute bony abnormality.  R. 770, 781.

On December 9, 2009, an MRI of the cervical spine showed diffuse

posterior disk prolapsed at the C4-5, with prominent right lateral,

component causing deformity of the contiguous thecal sac and the

contiguous spinal cord.  The MRI showed narrowing of the C4 and right C5

neural foramen, mild central spinal stenosis at C3-4, borderline spinal

stenosis of the C5-6, posterior disk bulge versus protrusion at C6-7 without

significant neural encroachment, and multilevel degenerative disc disease at the C3-5 level.  R. 780.

On December 15, 2009, Bell went to see Cindy Root, L.C.S.W., at Blessing Hospital for complaints of anxiety and depression.  Bell stated that he did not think that he needed to be there, but he stayed for the full session and asked to return in a month.  He mentioned the death of his girlfriend.  He reported that he was making significant changes.  He achieved sobriety and was going to college.  Root assessed anxiety and bereavement.  R. 801.

On December 18, 2009, Bell underwent an MRI of his right knee. The MRI showed two large intra-articular loose bodies, multiple osteochondral defects involving the medial femoral condyle, some cartilage thinning involving the femoral and tibial components of the medial compartment, and abnormal signal within the posterior horn of the posterior medial meniscus that could extend to the posterior medial surface.  R. 782.

On December 22, 2009, Bell began undergoing physical therapy. Bell was discharged from therapy on February 12, 2010.  R. 803-807.

On March 23, 2010, Bell's sister Lenise Taylor filled out a three-page form describing Bell's physical abilities.  R. 325-27.  Taylor stated that Bell could not work because of muscle tears and rotator cuff problems in both

shoulders.  She opined that Bell could sit, stand, or walk for thirty minutes.
R. 326.  She stated that he had difficulty performing housework and had
problems bathing, showering and brushing his teeth.  She stated that Bell
was in pain and could not sleep or recline on his shoulders.  Taylor never
observed Bell interact inappropriately with the public.  Bell was stressed
when in pain.  Taylor stated that she never observed Bell having difficulty
understanding, remembering, or carrying out simple instructions.  R. 327.

The Administrative Law Judge (ALJ) conducted an evidentiary
hearing on July 27, 2010, in Hannibal, Missouri.  R. 34-89.  Bell appeared
with his attorney.  Vocational expert  Gary F. Weimholt also appeared at
the hearing.  R. 36.

Bell testified first at the hearing.  Bell testified that he completed high
school and was attending college.  He had completed thirty-one hours of
college courses as of the hearing.  R. 39.  Bell testified that he became
disabled on November 23, 2006, because on that date he was playing
softball, but was not able to throw anymore.  R. 39.

The ALJ asked Bell about his shoulder.  Bell testified that his
shoulder was painful.  Bell did not have surgery because, "I wasn't in a
good position to have it done."  R. 40.  Access to health care was an issue.
R. 40-41.  Bell testified that he could lift his arms above his head, but "it's

not free and easy." R. 50. He also experiences pain reaching forward. Bell testified if he moves his arms fast, "I kind of roll over the pain." He said moving slowly was different, "If it's slow, then I kind of feel the effects of the pain." R. 50. Bell testified that he could lift and carry two gallons of milk with his left arm, but not his right. R. 51. Bell was not taking any pain medication at the time of the hearing. R. 51. Bell testified that he did not feel any pain when he did not use his arms. R. 51.

The ALJ then asked Bell about his knee. The ALJ asked about the right knee, but Bell testified that the problems were with the left knee. Bell testified that the December 18, 2009, MRI report incorrectly stated that the MRI was of the right knee. Bell testified that the MRI was actually of his left knee. R. 52-53. Bell testified that he did not have confidence in the knee. He testified that the knee can give out while he is walking. Bell testified that the knee last gave out two or three weeks before the hearing. R. 53. Bell testified that the knee buckles and he must catch himself or else he falls. R. 54. If the knee gives out, Bell must wait a few minutes before resuming his activity. R. 54. The ALJ noted that Bell reported in 2007 that he could walk a mile and a half at one time in fifteen to thirty minutes. The ALJ asked if he could still walk that far. Bell testified that he could if his knee cooperated. R. 54.

Bell also testified that he had neck pain.  He testified that the pain was sharp and constant.  R. 55.  Bell tried not to turn his head because of the pain.  R. 56.  He testified that he turns his whole body to look to the side.  Bell testified that the neck pain limited his peripheral vision.  R. 56.  Bell also testified that leaning and tilting his head back was painful.  R. 56.  He also said that sitting hunched over a desk or computer was painful.  R. 57.

Bell then testified about his mental health.  Bell testified that he was not as happy as he should be.  The ALJ asked Bell whether the mental problems or the physical problems were keeping him from working.  Bell answered, "It really depends.  It could be mostly physical, sometimes mental."  R. 58.  Bell testified that he was more comfortable doing things by himself rather than with other individuals.  R. 58-59.  Bell testified that he went full time to college spring semester and was taking one class in the summer.  R. 59.

Bell testified that he was still sober.  He was attending AA meetings, but did not have a sponsor in Illinois.  R. 61.  Bell testified that he was living in a duplex with his sister.  R. 62.

Bell's attorney then questioned him.  Bell testified that he had sharp pain in his lower back three to five times a day.  R. 63-64.  Bell testified that

abrupt and jarring movements caused the pain.  He gave the example of riding a bus.  R. 64.  He also testified that he got headaches three times a day.  The headaches last for fifteen minutes at a time.  R. 71.  Movement makes the headaches worse.  Bell testified that he tries to remain still when he gets a headache.  R. 71.

Bell testified that he took three classes on campus and one class online the last semester.  The longest class required sitting for one hour and fifteen minutes without a break.  Bell testified that he could sit that long uncomfortably.  He had to change positions to alleviate the pain while sitting for that length of time.  R. 65.

Bell testified that the longest he could sit without getting up was two hours, but would not be comfortable.  R. 65-66.  He testified that he could sit for a total of five hours in a typical workday.  R. 66.  The ALJ asked if he would be able to "sit for more?"  R. 67.  Bell responded, "If it's broken up."  R. 67.

Bell testified that he could lift thirty pounds with his left arm three times a day.  R. 69.  He testified that he had difficulty bending and squatting.  R. 70.  Bell testified that he missed about seven days of classes because of his emotional problems.  He missed an additional three days of class because of physical problems.  R. 72.

Bell testified that he got anxiety attacks from being around too many people.  He testified that he experienced anxiety attacks at school.  He testified that his heart started to race.  He had to take a break when he had an anxiety attack.  R. 73-74.  He got attacks when he had to stand in front of the class and make a presentation.  R. 74.

Vocational expert Weimholt then testified.  The ALJ asked Weimholt:

> Assume a younger individual with a high school-plus education and the past work experience you've identified.  Further assume that individual was limited to the full range of light work, however their postural were at occasional.  Their ability to do overhead reach bilaterally was limited to frequent versus constant.  They would need to avoid excessive vibration at even a moderate level.  They (sic) peripheral acuity would be limited to only occasional, they should only occasionally need to do that.  Would there be – would such a person be able to do any of the past relevant work, clearly not since they're all at medium or higher.  Would there be other jobs in the regional and national economy for such a person?

R. 78-79.  Weimholt testified that such a person could perform the jobs of inspector and hand packager, with at least 187,000 such jobs available nationally; electrical assembler, with at least 150,000 such jobs available nationally; cleaner/housekeeper, with at least 150,000 such jobs available nationally; and some jobs under the cashier II title of the Department of Labor's Dictionary of Occupational Titles (DOT).  R. 79.

The ALJ asked Weimholt to assume further that the individual was also limited to only occasional interaction with the general public.  Weimholt

opined that such a person could still perform all of the jobs previously

listed.  R. 80.  The ALJ asked Weimholt to assume the individual was

limited to occasional overhead reaching rather than frequent overhead

reaching.  Weimholt opined that such a person could not perform the jobs

he previously listed, but could perform the jobs of information clerk, with

approximately 100,000 such jobs available nationally.  Weimholt also

opined that such a person could perform the job of unarmed security guard

or security surveillance monitor, with close to 800,000 such jobs available

nationally.  R. 81.

> The ALJ then asked Weimholt the following:
>
> [A]ssume again a younger individual with a high school-plus
> education and the past work experience you've identified.
> Further assume they're limited to sedentary work.  Their
> postural are at occasional.  Their ability to reach and reach
> overhead is limited to frequent.  Avoid moderate exposure,
> levels of vibration are moderate.  Peripheral acuity is limited to
> only occasional.  And would need a job with only occasional
> interaction with the public.

R. 82.  Weimholt opined such a person could perform the job of semi-

conductor assembly or plastic assembly work, with approximately 225,000

such jobs available nationally; and pharmaceutical packaging jobs, with

approximately 60,000 such jobs available nationally.  R. 82.  If the person

was limited to occasional reaching, the person could not perform these

jobs, but could perform the job of information clerk, with approximately

100,000 such jobs available nationally.  R. 82-83.

Weimholt opined that person could not work if he regularly missed

more than 2 days of work a month.  R. 83.  Weimholt also opined that a

person could not take breaks which total more than 30 minutes a day and

maintain employment.  R. 85.  Weimholt also opined that a person who was

away from his workstation for unplanned breaks on a regular basis could

not maintain employment.  R. 87.  The hearing was then concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on August 9, 2010.  R. 18-28.  The  ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant

to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of the claimant's age, education and

work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet the criteria in a

Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d),

416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his age,

education, work experience, and Residual Functional Capacity (RFC).

20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering his RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  Briscoe ex

rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater,

55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Bell met his burden at Steps 1 and 2.  He was not

engaged in substantial gainful activity and has severe impairments of a

right shoulder tendon tear, degenerative changes in the left knee and

degenerative disc disease of the cervical spine.  R. 20.  The ALJ found that

Bell's mental limitations of depression, polysubstance abuse, and anxiety

were non-severe because they did not cause more than minimal limitation in Bell's ability to perform basic mental work activities.  R. 21.  The ALJ considered the functional areas considered in the Listings for mental disorders, known as paragraph B criteria.  R. 21.  The paragraph B criteria concern the impact of mental impairments on activities of daily living, social functioning; concentration, persistence or pace; and episodes of decompensation.  See Listing 12.00C.  The ALJ relied on the opinions of Drs. Cushman and Paxton.  The ALJ noted that Dr. Cushman found a GAF score of 60.  The ALJ further noted Dr. Cushman's opinions that Bell could work if he wanted to.  The ALJ also relied on Dr. Paxton's opinions that Bell's impairments were non-severe.  R. 21.

At Step 3, the ALJ found that Bell did not meet any Listing.  R. 22.

At Step 4, the ALJ determined that Bell had the RFC to perform light work, limited to jobs in which he only occasional climbs, balances, stoops, kneels, crouches, and crawls; only frequently reaches; avoids moderate exposure to vibration; and occasionally must use his peripheral acuity. R. 22.  The ALJ relied on Bell's testimony that he could walk one and one-half miles when his knee does not give out, and it last gave out two to three weeks before the hearing; and his statement that he could lift twenty to twenty-five pounds.  The ALJ found that the objective medical evidence

only showed mild to moderate physical impairments.  The ALJ noted that no physician ever recommended surgery, and Bell was not on any pain medication at the time of the hearing.  The ALJ also noted that Bell has been able to attend college successfully.  The ALJ also relied on the opinions of Drs. Mallare, Paxton, and Amon.  R. 22-25.  Based on the RFC, the ALJ concluded at Step 4 that Bell could not perform his past relevant work because the work was at the medium exertional level or higher. R. 26.

At Step 5, the ALJ found that Bell could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and the opinions of vocational expert Weimholt.  R. 26-27.  The ALJ, thus, concluded that Bell was not disabled.  R. 27

Bell appealed.  On February 17, 2012, the Appeals Council denied his request for review.  The decision of the ALJ then became the decision of the Commissioner.  R. 1.  Bell then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ's decision is supported by substantial evidence. The finding at Step 1 is undisputed. Bell was not engaged in substantial gainful activity. The findings at Step 2 that Bell suffers from shoulder, knee, and cervical impairments are supported by medical evidence. The finding that Bell's mental limitations are not severe is also supported by substantial evidence. By April 2008, Dr. Mabanglo noted that Bell's depression was resolving. Dr. Cushman opined that Bell could work if he wanted to, and could handle the stressors of a competitive working environment. Dr. Paxton opined that his mental limitations were not severe. In late 2009, Bell asked for mental health counseling because he was applying for

disability and his lawyer recommended counseling, not because Bell

believed that he needed counseling.  Bell told the counselor Root that he

did not believe he needed mental health counseling.  Root did not diagnose

depression, but only anxiety and bereavement.  All this evidence supports

the ALJ's finding that Bell's mental problems caused, at best, mild

impairments; such a finding supports the ALJ's conclusion that the

impairments were non-severe.  See 20 C.F.R. § 404.1520a(d)(1).  The

ALJ's finding at Step 2 is supported by substantial evidence.  The ALJ's

finding at Step 3 is undisputed.

At Step 4, the ALJ's RFC finding is supported by the opinion of

Dr. Amon and Bell's testimony.  Bell testified that he could lift thirty pounds

three times a day and previously stated in 2007 that he could lift 20 to 25

pounds.  He testified that he could sit for two hours straight and could sit for

a total of five hours or more in a workday.  He also testified that he could

walk a mile and a half if his knee did not give out, and it last gave out two to

three weeks earlier.  All of this evidence supports the ALJ's RFC of limited

light work.  The RFC finding supports the conclusion at Step 4 that Bell

could not perform his past relevant work.  The RFC and Weimholt's

testimony supports the finding at Step 5 that Bell could perform a significant

number of jobs in the national economy.  Hence, the ALJ's finding that Bell

was not disabled was supported by substantial evidence.

Bell argues that the ALJ erred in finding that his mental limitations

were non-severe.  He argues that the ALJ did not consider how Bell's

impairments affected the four functional areas of activities of daily living

social functioning; concentration, persistence or pace; and episodes of

decompensation.  The Court disagrees.  The ALJ specifically considered

these four areas as the paragraph B criteria of the Listings on mental

impairments.  R. 21.  The ALJ further specifically relied on the opinions of

Drs. Cushman and Paxton.  Dr. Cushman gave Bell a GAF score of 60,

which put Bell on the line between mild and moderate symptoms or mild

and moderate difficulty in social functioning.  American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth

Edition, Text Revision (DSM-IV-TR), 33-34 (2000).[2]  Dr. Paxton opined that

Bell's impairments were non-severe.  Dr. Mallare opined that Bell had mild

restrictions on activities of daily living; mild difficulties maintaining social

functioning; and no episodes of decompensation.  Those opinions provide

substantial evidence to support the finding.  Bell's statements to health care

---

[2] The ALJ erred in stating that a GAF of 60 indicates mild psychological symptoms.  R. 21.  A GAF of 60 is at the top of the range of moderate symptoms or moderate difficulty in social functioning.  A GAF of 61 is the lowest level of mild symptoms or mild difficulty in social functioning.  DSM-IV-TR, at 34.  In light of the other evidence of Bell's mild limitations from his mental impairments, the error was harmless.

providers in late 2009 also support the conclusion that he was no longer suffering from severe mental problems.  Bell told Barry that he wanted mental health counseling because he was applying for disability and his lawyer recommended counseling.  He told the counselor Root he did not believe that he needed mental health counseling.  All of this evidence supports the ALJ's finding at Step 2.

Bell next argues that the ALJ failed to consider all of the evidence in determining the RFC.  The Court again disagrees.  The ALJ thoroughly analyzed the relevant evidence regarding his physical impairments.  Bell complains that the ALJ did not discuss his liver disease.  Bell cites no evidence that Bell's liver disease caused any functional impairment.  The ALJ, thus, had no need to mention the liver disease.  Bell complains that the ALJ did not mention any back pain.   The ALJ discussed Bell's degenerative problems in the cervical area of the spine.  Bell provided no medical evidence of any problems in any other area of the spine.  The ALJ did not err in limiting his discussion to the relevant medical evidence.  The ALJ also discussed Bell's other claims of pain and found them not to be credible.  Bell does not challenge the credibility finding.  The ALJ adequately discussed the relevant evidence in reaching his RFC finding.

Bell last argues that the ALJ erred in failing to give weight to the opinions of Bell's sister Lenise Taylor.  There was no error.  The ALJ considered the report and rejected it as inconsistent with the medical evidence.  The Court agrees.  Taylor's report is inconsistent with Dr. Amon's opinions, and with Bell's testimony and statements about his abilities.  Bell argues that the ALJ must make a specific credibility finding, but the persuasive authority cited by Bell only concern sworn testimony.  See e.g., Miller v. Callahan, 971 F.Supp. 393, 397-98 (S.D. Iowa 1997).  Taylor did not testify.  These cases do not apply.

WHEREFORE Defendant's Motion for Summary Affirmance (d/e10) is ALLOWED, and Plaintiff's Brief in Support of Motion for Summary Judgment (d/e 8) is DENIED.  The decision of the Commissioner of Social Security is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:   March 27 2013


_s/ Byron G. Cudmore_
UNITED STATES MAGISTRATE JUDGE